Christian J.
The important and interesting question we have to determine in this case is, whether a railroad company can by express contract limit its liabilitJ as a coff>Hion carrier, so as to protect itself’ against all injuries received and losses incurred, except by the gross negligence of the company, its agents, servants and employees.
While there are other questions presented in the record which it becomes necessary to pass upon, the main question, which was argued with much ability and learning by the counsel on both sides, is the one-above stated, and will be the question first considered.
The plaintiff in error, John T. Sayers, was a cattle dealer. He delivered, on the 3d January 1870, to the said railroad company, at Max Meadows, a station on said railroad, a lot of fat cattle for transportation to the city of Lynchburg, then the eastern terminus of' said road. The cattle were received by the agent of said railroad company, and the following paper, signed by said agent, was delivered to and accepted by said Sayers:
“Form Ho. 38—Transportation Department, Virginia and Tennessee Railroad Company.
Hotioe.—Live Stock in car loads will not be taken at the special rates indicated by the tariff, but will be charged first class rates on 15,000 pounds per small car, and 20,000 per large car load, unless the shipper- and agent execute the following Live stock contract: Received by the Va. and Tenn. Railroad of John T. Sayers, Jr., the following described live stock:

Consigned as per margin to be transported by the- *331 Ya. and Tenn. Railroad Company to its freight station at Lynchburg, Va., ready to be delivered to, and unloaded by the consignee, or upon his order, or to such company or carrier of the same to be forwarded beyond said station whose line may be considered a part of the route to the destination of said stock, it being distinctly understood that the responsibility of the Ya. & Tenn. railroad company and connecting lines, as common carriers, shall cease at destination, upon the following conditions, to wit:
That, whereas the Ya. & Tenn. railroad and connecting lines transport live stock only at first class rates, except when, on consideration of a reduced rate by the car load, the owner and shipper assumes certain risks specified below. Row, on consideration of the said railroad agreeing to transport the above described live stock at the reduced rate of thirty-six dollars and eighty cents per car load and a free passage to the owner or his agent on the train with the stock, the said owner and shipper do hereby assume and release the said railroad from all injury, loss and damage or depreciation which the animals or either of them may suffer in consequence of either of them being weak, or escaping or injuring themselves or each other, or in consequence of overloading, heat, suffocation, fright, viciousness, or of being injured by fire, or the burning of any material, while in the possession of the company; and from all other damage incidental to railroad or steamboat transportation, which shall not be established to have been caused by the■ gross negligence or delinquency of any of the officers or agents of the said railroad or steamboat companies.
* * * * And it is further agreed that the owners and shippers or persons in charge of stock assume and release said railroad company and eon *332 necting lines from all risk of personal injury while upon or about the train of the company.
And this agreement further witnesseth, that the said owner or shipper has this day delivered to said eompany the live stock described above to be transported ^ conc[p^OQS) stipulations and understandings above expressed, which have been explained to and fully understood and duly accepted by the said owner and shipper.” Signed T. J. Hanson, station agent, and endorsed “live stock contract between Ya. & Tenn. railroad and John T. Sayers, Jan. 3d, 1870.”
The cattle of the plaintiff (the defendant in error) were all destroyed in consequence of the car in which they were placed for transportation being precipitated over the Otter bridge on said railroad between Max Meadows, where they were shipped, and Lynchburg, the point of destination. Suit was brought by Sayers against the railroad company in the Circuit court of Wythe, the declaration charging, in various forms in several counts, that the injury and loss sustained by the plaintiff, in the destruction of his cattle, was caused by negligence of the agents, employees and servants of said railroad company. In the defence to this action the railroad company mainly relied upon their contract with the plaintiff; and while denying all negligence, insisted that under their contract with the plaintiff' they could only be held liable for gross negligence; which the evidence failed to establish.
The jury found a verdict for the plaintiff, and assessed his damages at one thousand three hundred and fifty-four dollars. Upon this verdict a judgment was entered for the plaintiff’; and thereupon the defendant applied for and obtained a writ of error from this court. The instructions offered by both plaintiff *333 and defendant, those refused and those given, raise the question whether a railroad company can limit its liability as a common carrier by express contract, so as to excuse itself for negligence, unless such negli gence amounts to gross negligence; in other words, whether it can by contract excuse itself from negligence at all. The court below held that it could not; that if the loss was occasioned by the negligence of the company or its agents, no contract they could make with the shipper or consignee, however plainly expressed, could release the company. It is this judgment of the Circuit court, thus expounding the law, we are first called upon to review.
This question is one of first impression in this state. While it has been the subject of much judicial discussion in England and many of the states of this Union, where the decisions have been to some extent conflicting, the precise question has never been decided by this court. We have, therefore, given to the subject a careful and candid investigation.
Railroad companies are invested with the powers and subject to the liabilities of common carriers. At common law persons and corporations exercising such public employment are, upon grounds of public policy, held to a stringent liability, which is not exacted of ordinary bailees. At common law, they are insurers, to a certain extent, of the goods entrusted to them, and are held responsible for all injuries thereto, except those caused by the act of God or the public enemies.
The law which fixed these rights and obligations is of ancient origin and founded upon grounds of public policy. The exclusive possession of the property in the carrier, the ordinarily exclusive possession by him of the means of evidence, the facility of embezzlement, and of collusions with thieves and robbers, and *334 the entire separation of the owner from his property during the transit, are some of the leading grounds of publicpolicy which gave rise to this extraordinary resP0Dsikiliky.
These rigorous rules of the common law: have been mogjgec|5 sometimes by legislation and more frequently by decisions of the courts, to the extent that the carrier may by express contract limit his liability as an insurer. Thus by an act of Congress passed in 1851 in relation to sea-going vessels, ship-owners are relieved from all responsibility for loss by fire, unless caused by their own design or neglect; and from responsibility for loss of money and other valuables named, unless notified of their character and value. And there is similar legislation in some of the states, as I am informed, but to whose statutes I have not access here. But the common law rules have been relaxed in most of the states by the decision of the courts, to the extent of granting by express contract, or notice brought home to the shipper, a limitation of their liabilities as insurers. Even the policy of such limitation has been doubted by learned judges and eminent writers on this subject. “As the duties and responsibilities of public carriers are prescribed by public policy, it has been seriously doubted,” says Mr. Justice Bradley, (17 Wall. U. S. R. 359,) “ whether the courts did wisely in allowing that policy to be departed from without legislative interference, by which needed modifications could have been introduced into the law.”
It would be an instructive and interesting investigation to trace the causes which led to the relaxation of the rigorous rules of the common law, and to note how strenuously the courts for a long time resisted all attempts of common carriers to limit their common *335 law liabilities. It is easy to perceive that the modification of the common law grew out of the great hardship incurred by the carrier in certain special cases; for instance, cases where goods of great value, or subject to extra risk, were delivered to him without notice of their character, or where losses happened by sheer accident without any possibility of fraud or collusion on his part, such as accidental fire, collision at sea, &c. Such cases as these led to a relaxation of the rule to the extent of authorizing certain exemption from liability in such cases, to be secured either by public notice brought home to the owner of the goods, or by inserting exemptions from liability in the bill of lading or other contract of carriage.
That a common carrier may limit his common law liability to the extent above indicated, may now be considered as well settled.
But the important question is, how far can he go beyond that? Can he secure by contract an exemption from liability for acts arising out of his own negligence or that of his agents? Gan he by contract limit his responsibility only to a case of gross negligence, as is attempted in this case ?
In this state, as before observed, these questions have never been the subject of judicial investigation. We must, therefore, look for authority to the works of eminent authors which are the recognized textbooks of the law on this subject, and to the decisions of the Supreme court of the United States and of our sister states, as well as the decisions of the English courts, and from these sources of high authority settle the law upon this important question for this state.
Mr. Justice Story in his work on bailments, § 571, says: “But an inquiry may be made whether the carrier will not be liable also for ordinary neg *336 ligence, as well as for gross negligence, notwithstanding such notices—(i. e., such notices as are brought home to the party, and thereby consti^ing an exPress contract.) There are dicta by various judges indicating that tbe common rule of ordinary diligence, in common cases of hire, is applicable to the ease of carriers under notice. On the other' hand there are declarations of judges at nisi prius, as well as their opinions in banc, which seem to put it as a question of gross negligence or not. The question may now be considered at rest, by an adj udication entirely satisfactory in its reasoning, and turning upon the very point, in which it was held that in case of such notice the carrier is liable for losses and injuries occasioned not only by gross negligence, but by ordinary negligence; or in other words, the carrier is bound to ordinary diligence.” The author, to sustain this view, refers to Wyld v. Pickford, 8 Mees. & Welb. 442, 461. Referring to that case, I find that Mr. Baron Parke uses the following language: “Upon reviewing the cases on this subject, the decisions and dicta will not be found altogether uniform, and some uncertainty still remains as to the ground on which cases are taken out of the operation of these notices.” After reference to a number of eases he says: “The weight of authority, however, seems to be in favor of the doctrine, that in order to render a carrier liable after such notice, it is not necessary to prove a total abandonment of that character, or an act of willful misconduct, but that it is enough to prove an act of ordinary negligence, which is gross negligence in the sense in which it has been understood in the last mentioned cases. ”
Judge Redfield, in his valuable work on Carriers and other Baillees, § 156, says: “There is certainly *337 something very incongruous and not a little revolting to the moral sense that a baillee for hire should be allowed to stipulate for exemption from the conse quences of his own negligence, ordinary or extraordinary. A laborer, domestic, or .mechanic, who should propose such a stipulation, would be regarded as altogether unworthy of confidence in any respect, and the employee who should submit to such a condition must be reduced to extreme necessity, one would suppose.” After an interesting review of the cases on the subject, and after quoting the general rule of law upon this point as stated by Baron Parke in Wyld v. Pickford (supra), the learned author remarks, § 163: “This seems to be placing the effect of such notices upon a reasonable basis, and most of the American cases will be found to have adopted in the main similar views.”
With this reference to, and extracts from, the works of Story and Pedfield, I come now to consider the cases decided by the Supreme Court of the United States and of the other states.
The question we are now considering has been more than once determined by the Supreme Court of the United States. The first case to be noticed is the case of The New Jersey Steam Navigation Company v. Merchants Bank of Boston, reported in 6 Howard 344, and decided in 1848. The ease was this, and grew out of the burning of the steamer Lexington. Certain money belonging to the bank had been intrusted to Harden’s express to be carried to Boston, and was on board the steamer when she was destroyed. By agreement between the steamboat company and Harden, the crate of the latter and its contents were to be at his sole risk. The court held this agreement valid so far as to exonerate the steamboat from the *338 responsibility imposed by law, but not to excuse them from misconduct or negligence. Mr Justice Nelson, delivering the opinion of the court, said: “Although he, the carrier, was allowed to exempt himself from losses arising out of events and accidents against which he was a sort of insurer; yet inasmuch as he had undertaken to carry the goods from one place to another, he was deemed to have incurred the same degree of responsibility as that which attaches to a private person engaged casually in the like occupation, and was therefore bound to use ordinary care in the custody of the goods.”
The next case which came before the Supreme Court of the United States was Philadelphia ¿f Reading Railroad Company v. Derby. That was the ease of a free passenger—a stockholder of the company taken over the road by the president to examine its condition—and it was contended in argument that as to him nothing but “gross negligence” would make the company liable. Mr. Justice Grier, delivering the opinion of the court, said: “When carriers undertake to convey persons by the powerful but dangerous agency of steam, public policy and safety requires that they be,hold to the greatest possible care and diligence; and whether the consideration for such transportation be pecuniary or otherwise, the personal safety of passengers should not be left to the sport ot chance or the negligence of careless agents. Any negligence in such cases may well deserve the epithet of ‘gross.’ ” 14 How. U. S. R. 486. In a subsequent case this doctrine was reaffirmed, “as resting not only on public policy, but on sound principles of law.” Steamboat New World v. King, 16 How. U. S. R. 469-494. In York Company v. Cen’l R. R., 3 Wall. U. S. R. 113, the same court, after conceding that the responsi *339 "bility imposed on the carrier of goods by the common law may be restricted and qualified by express stipulation, adds: Where such stipulation is made, and it does not cover losses from negligence and misconduct, we can see no just reason for refusing its recognition and enforcement.
In the case of Express Company v. Ronnledge Brothers, the carriers were sued for the value of gold dust delivered to them on a bill of lading, excluding liability for any loss or damage by fire, act of God, enemies of the government, or dangers incidental to a time of war. The company was held liable for a robbery by a predatory band of armed men (which was one of the excepted risks), because they negligently and needlessly took a route which was exposed to such incursions. The judge at the trial charged the jury that although the contract was legally sufficient to restrict the liability of the defendants as common carriei’s, yet if they were guilty of actual negligence, they were responsible; and that they were chargeable with negligence, unless they exercised the-care and prudence of a prudent man in his own affairs. The Supreme Court held this to be a correct statement of the law. 8 Wall. U. S. R. 342, 352.'
The most recent case decided by the Supreme Court of the United States is the case of Railroad Company v. Lockwood, 17 Wall. U. S. R. 357. This case would seem to be exactly in point. It was a case of injury to a cattle drover traveling on a stock train upon a free pass, and when there'was an express contract that he should take all risk of injury to the stock and of personal injury to himself. The unanimous judgment of the court in that case established the following propositions, as laid down by Mr. Justice Bradley: 1. A common carrier cannot lawfully stipulate for ex- *340 eruption from responsibility, when such exemption is, not just and reasonable in the eye of the law. 2. It is not just and reasonable in the eye of the law to stipulate for exemption from responsibility for the negligence of himself or his servants. 8. These rules apply both to common carriers of goods and common carriers of passengers. 4. They apply to a case of a drover traveling on a stock train to look after his cattle, and having a free pass for that purpose.
I have thus far given the adjudications of the Supreme court of the United States upon the question under consideration, as well as the opinions of authors of recognized authority, to show that a common carrier cannot by express contract limit his common law liability to the extent of exemption from responsibility for the negligence of himself or his servants.
I come now to notice the course of decision in the-different states of the Union.
First, as to the decisions in the state of Yew York. Up to the year 1858, the course of decision in that state had been in- conformity with the principles announced in the eases decided by the Supreme Court of the United States above referred to. But in a case decided in 1858— Wells v. N. Y. Central Railroad Company, 26 Barb. R. 641—the Supreme Court of that state seems to have given its assent, for the first time, to the proposition that a common carrier may stipulate against responsibility for the negligence of his servants; and this, contrary to the decisions before that time, may now be taken as the settled law of Yew York. See opinion of Mr. Justice Bradley, 17 Wall. U. S. R. 369. But this conclusion was reached against the earnest, protest of some of the ablest judges of that state,. And,Judge Davis, in Stimson v. N. Y. Central R. R. Co., 32 Yew York R. 333, 337, *341 significantly remarks, in commenting on the recent decisions in that state: “The fruits of this rule are already being gathered in increasing accidents through the decreasing care and negligence on the part of these corporations, and they will continue to be reaped until a just sense of public policy shall lead to legislative restriction upon the power to make this kind of contracts.”
In Pennsylvania a long course of decisions settles the doctrine that a common carrier cannot, by notice or express contract, limit his liability so as to exonerate him from responsibility for his own negligence or that of his servants.
In Farnham v. Camden R. R. Co., 55 Penn. St. R. 58, Chief Justice Thompson, delivering the opinion of the court, says: The doctrine is firmly settled in this state, that a common carrier cannot limit his liability so as to cover his own or his servants’ negligence. In Penn. R. R. Co. v. Henderson, 51 Penn. R. 315, a drover’s pass stipulated for immunity of the company in case of injury from negligence of its agents or otherwise. Judge Bead, after a careful review of the Pennsylvania decisions, says: This endorsement releases the company from all liability, for any cause whatever, for any loss or injury to the person or property, however it may have been occasioned; and our doctrine, settled by the above decisions, made upon grave deliberation, declares that such a release is no excuse for negligence. See also 8 Penn. R. 479; 16 Id. 67; 30 Id. 242; 63 Id. 14.
In Ohio the cases are very decided on this subject, and reject all attempts of the carrier to stipulate against his own negligence or that of his servants. In Davidson v. Graham, 2 Ohio St. R. 131, the court, after conceding the right of the carrier to make spe *342 cial contracts to a certain extent, says: “He cannot,, however, protect himself from losses occasioned by his own fault. He exercises a public employment, and diligence and good faith in the discharge of his duties are essential to his public duties. * * * * * And public policy forbids that he should be relieved by special agreement from that degree of' diligence and fidelity that the law has exacted in the discharge of his duties.” See also Welsh v. Pittsburgh, Ft. Wayne & Chicago R. R., 10 Ohio St. R. 65; Jones v. Vorhees, 10 Ohio R. 145; 21 Id. 722; 19 Id. 1, 221, 260.
The decisions of the Supreme courts of Maine and Massachusetts are to the same effect, by one unbroken current. To the same purport are the decisions of many of the other states, which time and space only permit me to mention passim, but which are well worthy of attentive perusal and more particular notice. See 81 Ind. 394; 2 Rich’d (Sou. Ca.) 286; 28 Georgia 543; 37 Alabama 247; 39 Miss. 822; 20 Louisiana Annual 302.
After this hasty review of the decisions of the-American courts on the question before us, I will now make brief reference to the English cases.
Up to the year 1832, the course of the English decisions had been uniformly against permitting a common carrier to contract for exemption of responsibility for loss or injury resulting from his own negligence or that of his servants. And consequently, in Mr. Justice Story’s work on Bailments, published in 1832, he correctly gives the state of the English law as stated supra. But between that time and the passage of the railway and canal traffic act, passed in 1854, there was a change of opinion on the subject; and it was held in several cases that carriers could stipulate for ex *343 emption from liability, even for their own gross negligence. See Carr v. Lancashire Yorkshire R. R. Co., 7 Exch. R. 707; Peck v. North Staffordshire Railway Co. 10 Ho. Lord Cases 473.
In the last named ease, decided in 1862, Mr. Justice Blackburn, after an able and interesting review of the course of decision in England on this subject, and referring to Mr. Justice Story’s work on Bailments, published in 1832, quoted in the opinion (supra), says:
“In my opinion, the weight of authority was in 1832 in favor of this view of the law; hut the cases decided in our courts between 1832 and 1854 establish that / this was not the law, and that a carrier might by a, special notice make a contract limiting his responsibility even in the cases here mentioned of gross negligence, misconduct, or fraud on the part of his servants; and, as it seems to me, the reason why the legislature intervened, in the railway and canal traffic act of 1854, was because it thought that the companies took advantage of these decisions (in Story’s language) “to evade altogether the salutary policy of the common law.”
In the same case, Lord Chief Justice Cockburn, referring to the case of Carr v. Lancashire & Yorkshire Railroad Co. (supra), in which it ivas held that a common carrier might by express contract release himself from liability even for gross negligence, says: “In a very short time after the decision of this case was pronounced, the act of Parliament was passed,” (known as the railroad and canal act). “It cannot be doubted that the object of the legislature in passing it was to prevent these contracts, in which any liability for negligence is either entirely excluded or made conditional on the payment of a premium.”
The railway and canal traffic act, passed in 1864, *344 adopted in consequence of these decisions, provides: “§ 7. Every such company shall be liable for the loss of, or any injury done to, any horses, cattle or other animals> or to any article, goods or things, in the receiving, forwarding or delivering thereof, occasioned ^ the neglect or default of such company or its servants, notwithstanding any notice, condition or declaration made or given by such company contrary thereto, or in anywise limiting such liability, every such notice, condition or declaration, being thereby declared to be null and void.”
It will thus be seen by this act of Parliament, the salutary rule of public policy, which prohibits a common carrier from limiting his liability so as to exonerate him from the consequences of his own negligence, has been in effect reinstated in England; and the evils growing out of the change in the course of decisions, and the departure from those wise and salutary decisions which had prevailed in the English courts for more than half a century, had at last to be corrected by an act of Parliament, restoring the older and better rule of law.
Prom this review of the American and English decisions, I am constrained to conclude that the great weight of authority is in favor of declaring that the salutary rule of law and public policy, which forbids a common carrier from exempting himself from liability by express contract or otherwise for his own negligence, whether gross or ordinary, should be firmly adhered to and maintained by the courts of this state.
But it is argued with much force by the learned counsel for the appellants, that parties have a right to make their own contracts; that it is no concern of the public on what terms an individual has his goods car- *345 Tied; that if he chooses to accept all the risks by paying less for the carriage, how does it concern the public, and what public policy does it violate, how are public morals or public interests affected? Is it not a restriction upon trade and commerce, and an invasion of personal rights, for the courts to interfere and to declare such agreements, voluntarily and deliberately made, null and void? Such arguments as these were also urged in the case of Railroad Company v. Lockwood (supra) 878, and were thus conclusively answered by Mr. Justice Bradley; and I cannot do better than to adopt his answer: “Is it true,” he says, “that the public interests are not affected by individual contracts of the kind referred to? Is not the whole business community affected by holding such contracts valid? If held valid, the advantageous position of the companies exercising the business of common carriers is such that it places it in their power to change the law of common carriers in effect by introducing new rules of obligation. The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle or stand out and seek redress in a court. His business does not admit such a course.
He prefers rather to accept every bill of lading or to sign every paper the carrier presents, often, indeed, without knowing what the one or the other contains. In most cases he has no alternative but to do this or abandon his business.” These cogent and just views of Mr. Justice Bradley are as strongly illustrated by the case we have before us as the one he was considering. In this ease the railroad company required the drover to pay on his cattle as first class freight, unless he -signed the contract. He therefore would have had to ,pay the enormous sum of $6.60 per head for each *346 animal, or $118 per car load, instead of $36. No drover could afford to pay these rates; and this case is a strong illustration of how completely parties are in the power of the railroad companies, and how necessary it is to stand firmly by those principles of law by which the public interests are protected. The inequality of the parties, the compulsion under which the customer is placed, and the obligations of the carrier-to the public, operate with full force to divest such transaction of validity. The business of the common carrier is mostly concentrated in the hands of powerful corporations whose position in the body politic enables them to control it. They do in fact control it, and impose such conditions upon travel and transportation as they see fit, which the public is compelled to accept. These circumstances furnish an additional argument, if any were needed, to show that the conditions imposed by common carriers ought not to be adverse (to say the least) to the dictates of public policy and morality. Contracts of common carriers, like those of fiduciaries, giving them a position in which they can take an undue advantage of the persons with whom they contract, must rest upon their fairness and reasonableness. It was for the reason that the limitations of liability, first introduced by common carriers into these notices and bills of lading, were just and reasonable, that the courts sustained them.
It was just and reasonable that they should not be responsible for losses happening by sheer accident, or the dangers of navigation, that no human skill could guai’d against; it was just and reasonable that they should not be chargeable for money or other valuable-articles liable to be stolen or damaged, unless apprized of their character or value; it was just and reasonable that they should not be responsible for articles liable- *347 to rapid decay, or for live animals liable to get unruly from fright, and to injure themselves in that state, when such articles or animals became injured without their fault or negligence And when any of these just and reasonable excuses were incorporated into notices or special contracts assented to by their customers, the law might well give effect to these without the violation of any important principle, although modifying the strict rules of responsibility imposed by the common law. The improved state of society and the better administration of the laws had diminished the opportunities of collusion and bad faith on the part of the carrier, and rendered less imperative the application of the iron rule that he must be respousible at all events. Hence the exemptions referred to were deemed reasonable and proper to be allowed; but the proposition to allow a public carrier to abandon altogether his obligations to the public, and to stipulate for exemptions that are Unreasonable and improper, amounting to an abdication of the essential duties of his employment, ought never to be entertained.”
I think, therefore, “that,” to use the language of Chief Justice Bedfield, “ every attempt of carriers by general notices or special contract to excuse themselves from responsibility for losses or damage resulting in any degree from their own want of care and faithfulness is against that good faith which the law requires as the basis of all contracts or employments, and therefore based upon principles and a policy which the law will not uphold.”
But the learned counsel for the appellant, in his able argument in behalf of the company, insisted that the law recognized different degrees of negligence, and it was legitimate for a common carrier to limit his liability to losses or damage from all causes, except gross *348 negligence, as was done in this case by express contract. I think an examination of the authorities will show that the distinctions between “ gross” negligence and ordiQary negligence are too vague and shadowy to be of any practical importance in the adjudication of quegf.jong Qf tJjjs gork
The tendency of judicial opinion is adverse to any distinction between gross and ordinary negligence. In each case the negligence, whatever epithet we give it, is failure to bestow the care and skill which the situation demands, and hence it is more strictly accurate to call it simply “ negligence.” The decided preponderance of authority is in favor of abolishing the vague and uncertain distinctions between the different degrees of negligence, and to hold the public carrier bound whenever it is shown that the loss or damage is occasioned by negligence at all, whether gross or ordinary; or, in other words, the carrier is bound to ordinary diligence. See 1 Smith Lead. Cases (7th Am. ed.) 453; Story on Bailments, § 571; Wyld v. Pickford, 8 M. & W. 442; 11 Id. 115; 2 Queen’s Bench 661; 14 Howard 486; 17 Wall. 383.
I am, therefore, of opinion that the circuit court of Wythe county did not err in giving the instructions which it gave the jury, or in refusing those which it refused to give, both sets of instructions presenting in different forms the question we have been discussing, and the said court having decided that the railroad company cannot by express contract exonerate itself from liability for loss or damage occasioned by the negligence (whether gross or ordinary) of its agents, servants or employees.
There are now two other grounds of error assigned which remain to be noticed. First, as to the demurrer to the declaration; second, as to the admissibility of *349 certain evidence offered by the plaintiff' and admitted by the court.
As to the first, it is sufficient to remark that a careful inspection of the declaration shows that each count is a count in assumpsit, and no one of them in tort; so that in fact there is no misjoinder of counts as claimed by the counsel for the plaintiff' in error, and the Circuit court was right in overruling the demurrer.
The next ground of error assigned presents a more serious question, and requires a more particular notice. It is raised by the third, fourth and fifth bills of exception taken by the defendants, and presents the question whether the evidence therein set forth was competent to go to 'the jury.
It was proposed by the plaintiff’ to prove by the witness, Parish, that he heard a negro brakesman, who was on the train with plaintiff’s cattle, say, “ That had it not been for the brake on the East Tennessee car the train would have run off with them coming down the Alleghany mountains.” This remark of the brakes-man was made before the accident, and at Salem, a distance of forty-two miles from the scene of the disaster. It was further proposed, on the part of the plaintiff, to prove by the witness Crockett that he heard one Burroughs, who was a section-master on defendants’ road, embracing the point where the accident occurred, say that “ he (Burroughs) expected an accident on that part of the road where said accident did take place.” This conversation took place sometime after the accident happened, and when Crockett and the plaintiff were coming from Lynchburg on a special train back to the point of the accident, the said section-master, Burroughs, being on said special train with them.
The question is, whether these declarations of the *350 brakesman and section-master were competent to goto the jury. The court below admitted the evidence.
Was this error? It is insisted that these declarations were admissible (though hearsay) as the declarations of agents. It is true that where the acts of the agent will bind the principal, there, his declarations, representations, and admissions, respecting the subject-matter, will also bind him, if made at the same time and constituting part of the res gestae. They are of the nature of original evidence and not of hearsay, the representation or statement in such cases being the ultimate fact to be proved, and not an admission of some other fact. The parties own admission, whenever made, may be given in evidence against him; but the admission or deelai’ation of his agent, binds him only when it is made during the continuance of his agency in regard to a transaction then depending etdumfervet opus. It is because it is a verbal act and part of the res gestae that it is admissible at all. It is to be observed that the rule admitting the declarations of the agent is founded upon the legal identity of the agent and the principal, and .the declaration of the agent to bo admissible, must be part of the res gestae. 1 Greenleaf, Redfield’s edition, § 113, 114; Story on Agency, § 134, 137.
But it is argued with some foi’ce, that these genei’al rules do not apply to corpo3’ations which do their business entirely through agents, and that companies engaged in the transportation of freight and passengers are responsible for the declarations of their agents and employees, through whose instrumentality their whole business is transacted. This is a striking view of the subject, and some few cases it is admitted may be found adopting this view. But Chief Justice Redfield, in his edition of 1 Greenleaf, p. 135, § 114 (a) and *351 notes, has collected the authorities, and says: “In general such companies are not responsible for the declarations or admissions of any of their servants beyond the immediate sphere of their agency and during the transaction of the business in which they are employed. Thus the declarations of the conductor of a railway train, as to the mode in which an accident occurred, made after its occurrence, or those of an engineer, made under similar circumstances, are not admissible.” This is authority exactly in point. See also Griffin v. Montgomery &c. R. R. Co., 26 Geo. R. 111; Robinson v. Fichburg &c. R. R. Co., 7 Gray’s R. 92. In Lucy v. Hudson River R. R. Co., 17 Yew York Court of Appeals R. 181, it was held that the declaration of the driver of a car, after the car had stopped, assigning the reason why he did not stop the car and thus prevent the injury to the plaintiff while crossing the street, that he could not stop the car because the brakes were out of order, being made after the injury was inflicted and the transaction terminated, is not admissible against the company, in whose employ such driver was, it being mere hearsay. See also to this same effect the Bellefontaine Railway Co. v. Hunter, 5 American R.; Moore v. Meacham, 10 N. Y. R. 207; Lane v. Bryant, 9 Gray’s R. 245.
I think, therefore, upon principle and authority, that the declarations of the brakesman and section-master made at the time, and under the circumstances when made, were not a part of the res gestee, but mere hearsay, and ought to have been excluded. There was no reason why the brakesman and section-master should not have been examined as witnesses, and their declarations not being made at such time and under such circumstance as make them a part of the res gestee were mere hearsay.
*352 It is argued, however, that the evidence, if excluded, would not have changed the verdict of the jury, as the case was clearly made out without it. It is impossible for this court to estimate the effect which this evidence had on the minds of the jury, and it would be going beyond our legitimate fuuction to enter upon any such vain speculation.
The court erred in admitting the evidence, and it is our province, without speculating how the evidence might have affected the minds of the jury, simply to declare it inadmissible, and for this error of the court to reverse the judgment, and to remand the cause to the said Circuit court for a new trial, to be had therein in accordance with the principles declared in the foregoing opinion.
The judgment was as follows:
This day came again the parties by their counsel; and the court, having maturely considered the transcript of the record of the said judgment and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that there is no error in the judgment of the said Circuit court in giving the instructions given, or in refusing those refused; this court being of the opinion that the said Circuit court correctly expounded the law of the case, and that there was no error in overruling the demurrer, this court being of opinion that all the counts were counts in assumpsit and none in tort, and consequently there was no misjoinder of counts; but that the said Circuit court erred in admitting the evidence of the witnesses Crockett and Parish as to the declarations made by the brakesman and section master, those declarations not being made at such times and under such circumstances as would have made them *353 part of the res gestee, but mere hearsay, which ought to have been excluded. Therefore it is considered by the court, that for this error the said judgment of the said Circuit court be reversed and annulled, and that the defendant in error pay to the plaintiffs in ■ error their costs by them about the prosecution of their said writ of error in this behalf expended; and the cause is remanded to the said Circuit court, with instructions. to set aside the verdict of the jury and try the cause anew, excluding the aforesaid evidence if again offered.
Judgment reversed.