## Wytheville.

NORFOLK & WESTERN RAILROAD CO. V. HARMAN & CROCKETT.

### JULY 11, 1895.

#### Absent, Buchanan, J.*

1. COMMON CARRIER—*Shipping Facilities—Negligence.*—When a railroad company holds itself out as a common carrier of live stock, the law imposes upon it the duty to provide suitable and safe facilities, such as yards or pens, both at the place of shipment and the place of destination, for receiving and discharging the live stock offered to it for shipment over its road. If it permits salt water to be in such pen accessible to lambs offered for shipment, it is guilty of negligence and liable for the loss occasioned thereby.

2. COMMON CARRIER—*Shipping Facilities—Contract against Negligence.*—Although the printed contract of shipment stipulates that the carrier of stock shall not be liable for any injury to the stock until they are loaded into the car, and the car-door fastened or secured by the conductor, and shall only be liable for the safe carriage and delivery of the stock to its connecting lines, yet if the injury which occasioned the loss was inflicted at the shipping point before loading, through the failure of the carrier to provide safe and suitable shipping facilities, such failure is negligence and the carrier is liable, though the loss actually occurred beyond the line of such carrier.

3. PRINCIPAL AND AGENT.—The vendor of stock, who contracts to deliver the same to a railroad company for shipment on account of the purchaser, is not the agent of the purchaser in making such delivery.

Error to a judgment of the Circuit Court of Smyth county, rendered April 10, 1893, in an action of trespass on the case,

---

* Judge Buchanan had been counsel in the court below.

wherein the defendants in error were the plaintiffs, and the plaintiff in error was the defendant.

*Affirmed.*

*Bolling & Stanley,* for the plaintiff in error.

*James L. White* and *B. F. Buchanan,* for the defendants in error.

RIELY, J., delivered the opinion of the court.

The defendants in error, on June 13, 1891, delivered to the Norfolk and Western Railroad Company two lots of lambs to be transported to Jersey City, in the State of New Jersey. One lot was received by the railroad company at its station at Saltville, Va., and the other lot at Pounding Mill, in Tazewell county, Va. A large number of the lambs having died on the route, the owners charged that their death was caused by the negligence of the railroad company, and brought suit to recover damages for the loss sustained.

The railroad company having undertaken to furnish a stock pen at Saltville for the purpose of enabling shippers of live stock to load the same upon its cars, its negligence upon which the plaintiff's right of action was founded, consisted, it was alleged in the declaration, in not furnishing a suitable stock pen and maintaining it in a good and safe condition, but permitting salt water or brine, which was poisonous and dangerous to stock when drunk by them, to be in the pen, whereby the lambs had access to and drank of it, and sickened and died.

When a railroad company holds itself out as a carrier of live stock, the law imposes upon it the duty to provide suitable and safe facilities, such as yards or pens, both at the place of shipment and the place of destination, for receiving

and discharging the live stock offered to it for shipment over its road. *Covington Stock Yards Co.* v. *Keith et al.*, 139 U. S. 128; and 23 Amer. & Eng. Ency. of Law, 902. It appears from the certificate of the evidence that the railroad company did provide at its station at Saltville, from which one of the lots of lambs were shipped, a stock pen and a force pen, to enable shippers of live stock to load the stock on their cars. In the stock pen was a culvert, which was made to convey the water from a fresh-water spring, and about one-third of the culvert, at each end, was broken in and uncovered. There was a tank of salt water on the hillside above the pen from which the salt water escaped and flowed into the pen and into the culvert. Many of the lambs, when put into the pen to be loaded, although the loading was done as rapidly as possible, drank of the salt water, in spite of the efforts of the men engaged in loading them to prevent it.

It is shown by the evidence that Harman & Crockett had bought the lambs from persons in the surrounding country, who delivered the lambs at the railroad station for shipment, and that Harman & Crockett knew nothing of there being salt water in the pen until they learned the fact after the disaster that had happened to their stock; but it was known by the railroad company's agent at its station at Saltville.

The lambs, which were shipped from Saltville, left there on the cars about five o'clock in the afternoon and arrived at Lynchburg at eleven o'clock the next morning. Mr. Crockett, one of the owners, met them at Lynchburg, and had them unloaded for the purpose of feeding and watering them.

He fed them some hay, but finding them very thirsty and feverish, he turned the water off, and they got very little, if any, at that point. They arrived at Baltimore the next day, when they were found to be still so very thirsty that they could hardly be gotten away from the water, and were in bad condi-

tion, and looking as if sick.   When they arrived at Baltimore the two lots were unloaded and turned into the feeding pens together, and became intermingled.   At Baltimore they commenced to die, and by the time they arrived at Jersey City, the next day, eighty-five had died on the route, sixty-one more died the following night, and others were sick, which very materially affected the sale of those that had survived.

It appears from the certificate of the evidence, as testified to by men of large experience in the live-stock business, that it is dangerous to animals to give salt to them and then let them have free access to water; that the salt creates an intense thirst, which causes the animals—especially lambs—to drink immoderately of the water, the effect of which is to produce sickness fi om which they are liable to die.

It being proved that the stock pen at its station at Saltville was the means provided by the railroad company to enable shippers to load their live stock on its cars, and that it permitted salt water to be in the pens, accessible to the lambs, the company had not performed its legal duty to furnish and maintain suitable and safe facilities to shippers for receiving their stock for shipment.   It was therefore guilty of negligence, and liable to the plaintiffs for such loss as was caused by its negligence.

It appearing from the evidence that salt water is dangerous to live stock, when drunk by them; that it was in the stock pen at Saltville, into which the lambs had to be driven for the purpose of loading them on the cars; that the lambs, while being loaded, drank of it; that they were in good condition when put into the cars; and that they soon thereafter became very thirsty and feverish, and affected like stock that had been made sick by drinking water, after being salted— the jury were clearly justified in finding that this was the cause of their death.

It was argued by the plaintiff in error that it assumed no other liability than the safe carriage and delivery of the stock to its connecting line at Lynchburg; that it did this; and that its liability then ceased.    This defense cannot avail, for the evidence shows that the injury was done at Saltville, the shipping point, and in the pen it had provided to enable shippers to load their stock in its cars.

It was also urged that under the printed contract of shipment the railroad company was not responsible for any injury to the stock until they were "loaded into the car, and the car door fastened or secured by the conductor."    It failed, as we have seen, to furnish and maintain suitable facilities for receiving the live stock, of which it held itself out as a public carrier.    Such failure was negligence, and a common carrier cannot contract for exemption from liability for injury or loss caused by its own neglect.    Code of Va. sec. 1296; and *Va. & Tenn. R. R. Co.* v. *Sayers*, 26 Gratt. 328.    See, also, *Clarke* v. *Rochester*, &c., *R. R. Co.*, 67 Amer. Dec. 205, and the valuable note thereto.

It was further claimed that even if it was negligence in the railroad company to permit salt water to be in the pen which it had provided to enable shippers of live stock to load their stock in its cars, (and the only means which it had furnished for that purpose), yet that the plaintiffs were guilty of contributory negligence in allowing the lambs to get to the water while being loaded, and they cannot recover.    The evidence satisfactorily establishes the negligence of the railroad company, and that the loss sustained by the plaintiffs was due to such negligence.    Contributory negligence, to defeat a recovery, must be satisfactorily and affirmatively shown.    Unless it appear from the plaintiffs' evidence, it devolves on the defendant to prove it.    Contributory negligence on the part of the plaintiffs nowhere appears.

There is no evidence whatever that they knew of the existence of salt water in the loading pen, and it is not even pretended that they had any actual knowledge of it, but it is claimed that the men who brought the lambs to the station became aware of it.   This is true, and the evidence shows also that they used every effort to prevent the lambs from drinking the water.   The fact that they learned of the presence of the salt water in the pen does not fix contributory negligence upon the plaintiffs.   The men who delivered the lambs at the station, and put them in the cars, were not the employees of the plaintiffs.   They were the persons from whom Harman and Crockett had bought the stock to be delivered to the railroad for shipment.   In making the delivery, they were in no sense the agents of the plaintiffs.   They were simply fulfilling their part of the contract of sale.

Therefore, their knowledge was not the knowledge of the plaintiffs, and could not be imputed to them.   The doctrine of constructive notice by agency does not apply.   The defense of contributory negligence is not sustained.   On the trial, the jury found a verdict in favor of the plaintiffs for $742, with interest thereon from June 17, 1891.   The defendant company moved the court to set aside the verdict, but the court refused to do so, and gave judgment thereon.   It was proved that the lambs would average about seventy-seven pounds each, and that they were worth in the New York market—the place where they were to be sold—from seven and a half to eight cents per pound.   One hundred and forty-seven died before they could be gotten to market.   It is an easy calculation to show that, exclusive of any compensation for those that were sold as "sick lambs," the amount of the verdict of the jury was rather below than above the actual damages sustained by the defendants in error.

And the evidence was ample to sustain the charge of the

plaintiffs in the suit that the loss they had sustained was due to the negligence of the railroad company.    The court rightly overruled the motion for a new trial.

There is no error in the judgment appealed from, and same must be affirmed.

AFFIRMED.