Sullivan,
Jan. 3, 1905.

### FLINT *v.* BOSTON & MAINE RAILROAD.

A railroad company is bound to maintain cattle guards only against the owner or custodian of animals rightfully on the adjoining land or in the highway.

Railroad companies engaged in the transportation of live stock are bound to provide suitable yards for the receipt and delivery of such freight, and are authorized to hold temporarily, for the convenience of themselves or their patrons, animals awaiting shipment.

In the absence of special orders, a station agent who has general charge and direction of the property and business of a railroad company is authorized to assume, in behalf of the corporation, the custody of live stock offered for transportation.

Where cattle in the custody of a railroad company escape through the latter's negligence, stray upon the tracks, and are killed, the corporation cannot avoid liability on the ground that the animals were trespassers upon other portions of the railroad property after their escape from the shipping yard in which they had been confined.

Certain evidence deemed sufficient to warrant a finding that cattle offered for transportation were taken in custody by a railroad company pending shipment, and escaped through the negligence of an agent of the corporation.

CASE, for killing the plaintiff's cattle. Trial by the court. Transferred from the May term, 1904, of the superior court by *Wallace,* C. J. One count of the declaration alleged that the cattle, having escaped from the defendants' cattle yard at Claremont Junction, went upon the defendants' railroad by reason of their

negligence in not maintaining cattle guards at a certain highway, and were run over and killed.

The plaintiff's evidence tended to prove the following facts: The defendants' railroad crosses a highway at Claremont Junction nearly at right angles. There are no cattle guards at this crossing. The defendants have long maintained a cattle yard at that station, on the south side of the highway, for the use of shippers of cattle over their road. The yard is divided into three pens. The hasp of the door to one of the pens was out of repair and would not fasten the door. About a week prior to September 21, 1903, the plaintiff applied to the defendants' station agent at Claremont Junction for a car to ship certain cattle from that station to Ipswich, Massachusetts. The defendants were unable to furnish a car until September 19. The plaintiff decided to ship the cattle September 21; and in the afternoon of that day he drove seventeen cows and six calves to the station for shipment to Ipswich, and placed them in the cattle yard, a portion of them being put in the pen having the defective door fastening. He informed the station agent that the cattle were there, and that he was ready to ship them that afternoon. The agent learned upon inquiry of the plaintiff that he had no United States license to ship the cattle into another state and informed him that he must procure such license before the shipment could be made. The plaintiff thereupon telephoned to the United States cattle inspector at Boston and arranged to have an inspector sent to Claremont Junction that night. The agent told the plaintiff to leave the cattle and ship them in the morning. The plaintiff decided to leave them in the cattle yard over night, and there was no objection to his doing so on the part of the agent. The agent informed the plaintiff that the door of one of the pens would not fasten, and that he must nail it with a board. The plaintiff nailed two boards across the door in the agent's presence, and went away about six o'clock, leaving the cattle in the yard. He returned between six and seven o'clock the next morning, bringing hay to feed the cattle and vessels for use in watering them and in milking the cows. He found that the cattle had pressed open the door which he had fastened, and had escaped. Four cows and six calves crossed the highway, went in a northerly direction on the railroad, and were killed by a passing train.

The defendants' evidence tended to prove the following facts: Their station agent told the plaintiff he might leave the cattle in the yard at his own risk. While the cattle which were killed were in the yard the agent took no charge of them, nor did he assume charge of the survivors until the next day, when he gave a shipping receipt for them. Among the defendants' rules were the

following: "Station agents have charge of the company's property at their respective stations, and the general direction of the business of the road at those points, subject to the general rules and special orders. They will have charge of the tracks, sidings, switches, grounds, etc., at the station."

The parties agreed that if there was evidence sufficient to entitle the plaintiff to have the question of the defendants' alleged negligence submitted to the jury, the plaintiff should have judgment for $216 and interest from the date of the writ; otherwise (excepting as to certain contingencies not material as the case has been considered), there should be judgment in favor of the defendants.

*Frank O. Chellis*, for the plaintiff.

*Ira Colby & Son*, for the defendants.

CHASE, J. The agreement of the parties has substantially the effect which a denial of the defendants' motion for the ordering of a verdict in their favor, subject to exception, would have. The principal question, therefore, is: "Whether in the whole case there is any substantial evidence tending to prove the affirmative of the issues made by the pleadings? . . . Or, expressing the question in another form: assuming the truth of the evidence and construing it most favorably for the plaintiff, does it conclusively appear therefrom that the defendants were not negligent? Must all fair-minded men arrive at that conclusion upon considering it, or might some arrive at the opposite conclusion?" *Carney* v. *Railway*, 72 N. H. 364, 369.

The plaintiff's allegation is that his loss was due to the defendants' negligence in not maintaining cattle guards in their railroad upon each side of a neighboring public highway which it crossed at grade, in consequence of which the cattle, after their escape from the yard, went upon the railroad and were killed. There were no cattle guards at the crossing as alleged. The statutes provide that "the proprietors of every railroad shall erect and maintain a sufficient fence upon each side of their road, except at the crossings of public highways; and at every such crossing they shall construct and maintain, upon each side of the highway, sufficient cattle guards or fences to prevent cattle from passing upon their road." P. S., c. 159, s. 23. The law is well settled that "it is only against the owner or custodian of animals rightfully on the adjoining land or in the highway that railroads are obliged to maintain fences or cattle guards," by virtue of this statute. *Hill* v. *Railroad*, 67 N. H. 449, and authorities cited. The question

therefore arises whether, as against the custodian of the plaintiff's animals, they were rightfully or wrongfully in the highway from which they went upon the defendant's track.

If the animals were rightfully in the highway as against their custodian, they must have been rightfully there as against the plaintiff. If the defendants were the custodians of the animals at the time of the escape from the shipping yard, they would not be in a position to claim that the animals were trespassers upon other portions of their grounds after the escape. If, for instance, the animals went from the yard directly upon other portions of the defendants' right of way and caused injury to the defendants, the plaintiff would not be liable in trespass for the injury. While in one sense the animals would not be rightfully at the place of injury, yet their presence would be due to their escape from custody, the risk of which the defendants, as their custodians, assumed. Their presence upon the defendants' land outside the yard would be due to a breach of their duty to keep the animals within the yard. As against the defendants themselves, the animals would, in a sense, be rightfully upon the defendants' land after the escape. See *Chapin* v. *Railroad*, 39 N. H. 53, 60; *Morse* v. *Railroad*, 66 N. H. 148, 149. The statute requires the defendants to fence and maintain cattle guards against animals upon their land under such circumstances. Hence it becomes necessary to determine the relation of the defendants to the animals. Were they the custodians of the animals at the time of the escape?

The defendants were engaged in the business of common carriers—not that of keepers of live stock independently of transportation. No question is made that a part of their business was the transportation of live stock. See *Rixford* v. *Smith*, 52 N. H. 355. As an incident to this business, it was their duty to provide suitable facilities for receiving and delivering animals in connection with transportation. " The proprietors of every railroad shall furnish to all persons reasonable and equal terms, facilities, and accommodations for the transportation of persons and property over their railroad, and for the use of depots, buildings, and grounds in connection with such transportation." P. S., c. 160, s. 1. " When animals are offered to a carrier of live stock to be transported, it is his duty to receive them; and that duty cannot be efficiently discharged, at least in a town or city, without the aid of yards in which the stock offered for shipment can be received and handled with safety and without inconvenience to the public, while being loaded upon the cars in which they are to be transported." *Covington Stock Yards Co.* v. *Keith*, 139 U. S. 128, 134. The shipping yard at Claremont Junction evidently was provided in

fulfilment of this duty, so far as the business of that station was concerned. It had the same relation to the transportation of live stock that the defendants' freight houses have to the transportation of ordinary merchandise. See *Mason* v. *Railway*, 25 Mo. App. 473 ; *Norfolk etc. R. R.* v. *Harman*, 91 Va. 601. As a further incident of the defendants' business, they were authorized to hold temporarily in their shipping yards, for the convenience of themselves or the owner, animals received for transportation. Their authority in this respect as to animals does not differ from that as to merchandise. If they hold the animals or merchandise for their own convenience, they are under the obligations of a common carrier while so doing, the same as while transporting them; but if they hold them for the convenience of the owner, their obligation is only that of a depositary. *Moses* v. *Railroad*, 24 N. H. 71, 82; *Barter* v. *Wheeler*, 49 N. H. 9, 23; *Barron* v. *Eldredge*, 100 Mass. 455.

Some days prior to September 21, 1903, the plaintiff made an arrangement with the defendants' station agent at Claremont Junction for shipping his cattle to Ipswich, Massachusetts, at or about that time. His evidence tended to prove that, in consequence of the arrangement, the defendants had a car there for the purpose, September 19. In the afternoon of September 21, the plaintiff drove the cattle to the station and put them into the shipping yard, and notified the station agent that they were there, ready for shipment. He availed himself of the use of the yard proffered by the defendants as common carriers of live stock, in performance of the duty imposed upon them by the law. In the absence of a justifiable excuse, the defendants were bound to receive and transport the cattle as previously arranged. But it turned out that the plaintiff was mistaken as to his readiness to ship them; that they could not be shipped until he procured a license from a United States inspector. See 23 U. S. Stat. 32 (*c.* 60, *s.* 7); P. S., *c.* 113, *ss.* 1, 2. Upon learning this fact, the plaintiff immediately took steps to procure the license. He did not then and does not now deny the necessity of the license. The requirement caused delay in beginning the transportation. Two courses of conduct were open to the defendants: they might decline to accept the cattle until they were ready for immediate transportation; or the defendants might accept them and hold them as depositaries for the plaintiff's accommodation until he obtained the license. The defendants say that they adopted the former course; and instead of accepting the possession and custody of the cattle, they gave possession of their yard to the plaintiff to enable him to hold the possession and custody. The plaintiff denies this, and says that the defendants accepted the cattle

and held their possession and custody for his accommodation. The testimony bearing upon this issue is equivocal and somewhat conflicting. There is in the plaintiff's testimony no express declination by the defendants to receive the cattle and be responsible for their custody. According to it, the defendants' station agent told the plaintiff, without qualification or condition, to leave the cattle and ship them the next morning. It would be naturally inferred from the circumstances, that he meant by this to have the cattle left in the yard where they were. If he had not intended to accept them unconditionally in behalf of the defendants as depositaries, with a view to transportation after a few hours, it might seem to some impartial, reasonable men that he would have said so definitely. The defendants' testimony tends to prove that he did accompany the suggestion with the condition that the leaving of the cattle in the yard should be at the plaintiff's risk. Whether this condition was imposed or not, is a question of fact that cannot be determined here. A jury might find that the fact was as shown by the plaintiff's evidence, and the questions of law before the court must be considered as if they would so find. The plaintiff accepted the agent's proposition, and decided to leave the cattle in the yard. The agent informed the plaintiff of the defect in the fastening to one of the doors, and told him "he must nail it with a board." The plaintiff nailed two boards across the door in the agent's presence. This conduct of the agent with reference to the safety of the appliances relied upon for keeping the cattle in the yard, especially his presence while the boards were being nailed across the door, has a tendency to prove that he understood the defendants were responsible to some extent for their safe keeping. See *Mason* v. *Railway*, 25 Mo. App. 473. The fact that the plaintiff himself fastened the door is not, under the circumstances, inconsistent with this view. He appears to have done it under the direction and immediate supervision of the agent. There is also the evidence of the plaintiff's return in the morning, prepared to feed and water the cattle and milk the cows. A casual consideration of this fact by itself would naturally lead to the conclusion that he had the possession and care of the animals. But when it is considered that they were delayed in the course of transportation by an unforeseen circumstance, that steps had been taken which would probably render the delay very brief, and that the milk of the cows belonged to the plaintiff, this fact does not appear to be altogether inconsistent with the existence of an understanding on the part of both the station agent and the plaintiff that the animals were in the defendants' possession and custody. It thus appears that it might be reasonably found from the evidence that the defendants accepted the cattle to hold as depos-

itaries during the brief time required for removing the obstacle to their shipment. The evidence is of such ambiguous character that reasonable, impartial men might, and very likely would, differ in their conclusions. This circumstance renders it highly proper to submit the question to a jury for determination. The evidence of possession was as full and decisive as was that in *Smith* v. *Railroad*, 27 N. H. 86, concerning the possession of the hides there in suit after their arrival at the point of destination and notice thereof to the consignee, accompanied with a declaration of inability to store them and a request to take them away.

If the station agent had no authority to act for the defendants in this matter, they of course would not be affected by his acts. But there can be no doubt that he had authority. The defendants' general rules gave him charge of their tracks, sidings, switches, grounds, etc., at the Claremont Junction station, and the general direction of their business there, " subject to the general rules and special orders "; and there was no evidence of a general rule or special order that limited or modified the general authority granted. *Deming* v. *Railroad*, 48 N. H. 455.

But the defendants say that if the cattle were in their possession and custody, they escaped therefrom in consequence of the plaintiff's negligence in not reasonably securing the door having the defective fastening. The plaintiff apparently did everything in that respect that seemed to both him and the defendants' agent to be necessary. There is no evidence that the agent questioned the sufficiency of the fastening. A jury might find that there was no negligence in the method adopted; that a man of average prudence would deem the method sufficient to withstand any pressure that would naturally be brought against the door. Although, upon such finding, the defendants would not be liable to the plaintiff for damages arising from the escape of the cattle, yet the defendants, being depositaries of the cattle, could not charge the plaintiff for any damage the cattle did their other property after escape. By being depositaries of the cattle, they assumed the risk of injury to their property resulting from an escape, unless the escape was due to some peculiar viciousness of the animals which was unknown to the defendants and of which the plaintiff knew or ought to have known. There was no evidence of such viciousness. And if it were found, as it reasonably might be, that there was negligence in fastening the door, but that the defendants were solely responsible for it, either because the plaintiff acted as their servant in making the fastening or because they accepted the possession and custody of the cattle after the fastening was made, having full information as to its nature, they could not complain of injury to their other property from the cattle after escape. In

such case the escape would be directly attributable to their negligence. Although the negligence might not be of a degree that would render them liable to the plaintiff for a breach of their duty as gratuitous bailees, it would be sufficient to exempt the plaintiff from liability to them for injuries to their property. The cattle would not be trespassers upon their other property.

The animals which were killed crossed the highway and went northerly on the railroad track. As against the defendants, if depositaries of the animals, they were not trespassers either upon the defendants' grounds or the highway. *Cressey* v. *Railroad*, 59 N. H. 564. There being no cattle guards in the railroad upon the sides of the highway, the defendants were liable for killing them, although the defendants' servants did not discover their presence upon the railroad and were not guilty of negligence for not discovering it. *Smith* v. *Railroad*, 35 N. H. 356.

The conclusion is that there was evidence sufficient to entitle the plaintiff to have the issues of fact above referred to submitted to the jury; and therefore, according to the agreement of the parties, the order must be,

*Judgment for the plaintiff for $216 and interest from the date of the writ.*

All concurred.