Russell v. Considine.

No. 20,788.

LEE RUSSELL and S. C. TUCKER, Partners as Russell & Tucker, *Appellants*, v. JOE CONSIDINE and The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellees*.

SYLLABUS BY THE COURT.

1. DAMAGES — *Cattle Drinking Polluted Water — Liability of Railway Company Not Shown*. The facts relied upon to fix liability on a railway company for damages to cattle which had drunk water polluted by a dipping fluid which had been splashed from a dipping vat belonging to a private citizen and established by the latter on property leased from the railway company examined, and held to show no liability on the part of the railway company.

2. SAME—*Individual Liability of Person Who Polluted Water*. The facts relied upon to fix liability for damages for the injury and death of cattle which had drunk water polluted by the splashing and overflow of an arsenic solution from a dipping vat maintained by a defendant for disinfecting cattle examined, and held sufficient to establish a *prima facie* case when tested by a demurrer to the evidence.

3. PUBLIC OFFICER—*When Personally Liable for Wrongful Conduct*. The rule that a public official is not personally liable for errors, mistakes or omissions in the discharge of his duties which call for the exercise of judgment or discretion unless such official shortcomings are willful, corrupt, or malicious, has no application to personal acts or omissions which do not pertain to his official duties.

Appeal from Chautauqua district court; ALLISON T. AYRES, judge. Opinion filed November 10, 1917. Affirmed in part and reversed in part.

*J. A. Ferrell*, of Sedan, for the appellants.

*William R. Smith, Owen J. Wood, Alfred A. Scott*, all of Topeka, *Chester Stevens*, and *Thomas E. Wagstaff*, both of Independence, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiffs brought this action for damages against the defendants for the poisoning of a large number of cattle in the Santa Fe stockyards at Elgin, in Chautauqua county. Plaintiffs shipped several trainloads of cattle from Texas through Fort Worth to Elgin, Kansas, to be pastured in northern Oklahoma, near Elgin. Several hundred of these

cattle arrived in Elgin on a rainy and stormy night in April, 1914. They were unloaded that night and kept in a pen next to the unloading chutes. The pen was supplied with water troughs and water. Next morning the cattle were driven from that pen into another pen adjoining the first, called the "crowding pen," it being the pen where the cattle were crowded so that they could be forced into a dipping vat for disinfection, that being a necessary preliminary to the entrance of the cattle into Oklahoma under federal and Oklahoma laws. The stockyards were the property of the Santa Fe railway company, and the dipping vat was the property of Joe Considine, and he held under a lease from the Santa Fe railway company a small portion of the stockyards upon which the vat was situated and some additional space beside it. Considine was the federal and Oklahoma live-stock inspector. The railway company had nothing to do with the dipping of the cattle. The stockyards at Elgin are bounded on the north by the Santa Fe railway tracks and on the south by the Kansas-Oklahoma state line. The length of the stockyards north and south is some 800 or 900 feet. The stockyards are about 200 feet in width east and west. The part leased to Considine for the dipping of cattle is 22 feet wide and 170 feet long, and is situated in the west part of the stockyards just inside the fence which skirts their western limits.

The petition alleged, and the plaintiffs' evidence tended to prove, that as the cattle went into the dipping vat some of the dipping fluid splashed over the side of the vat and down into a ditch just outside the vat and outside the stockyards fence. At the south end of the vat was a dripping space where the dipped cattle were kept for a short time until the dipping fluid could drip from their bodies. The dipping fluid was a solution of arsenic, sal soda, caustic soda, and water. There was a cistern under or near the dripping space which caught the drip so that it could be pumped back into the vat and reused. There was some overflow from this cistern, and part of it formed a pool or "swag" in or near the dripping space. Some of this overflow passed out into the ditch through the stockyards fence. The ditch drains most of the town of Elgin and flows south alongside the stockyards. Some two or three months before this shipment of cattle was received, some cattle belonging to

Russell v. Considine.

persons about Elgin were poisoned, presumably by drinking from this ditch, and complaint was made to Considine and he agreed to pay for them, and about ten days before plaintiffs' shipment arrived he dammed up the ditch some distance south of the dipping vat so as to turn the water east and across the stockyards through some of the pens owned and controlled by the railway company and not leased to Considine. A wire fence was also constructed outside the ditch to keep the town cattle from drinking the polluted ditch water.

After the cattle were dipped and allowed to stand and drip for some time they were driven south into other pens of the stockyards, and some of them drank from the ditch there; and as they were led and driven on their way to the Oklahoma pastures they gave signs of sickness—slobbering, scouring, etc. Soon one dropped and was left. Others sickened soon afterward. The first was found dead that night, and within two or three days 35 of them died, and the remaining 768 head "became sick and remained sick for many days, became gaunt and puny, and for a long time refused to eat, grow or put on flesh and fatten."

The plaintiffs asked for judgment for the value of the cattle which died and for damages as to the others.

Separate answers and defenses were presented by the railway company and by Considine. At the conclusion of plaintiffs' evidence each of the defendants demurred thereto. Both demurrers were sustained, and plaintiffs appeal.

It is not clear how any responsibility for the death of the cattle can be attributed to the railway company. The Santa Fe had nothing to do with the dipping of the cattle. It had no notice that the water in the ditch was poisonous. While the ditch outside its west fence had been turned so that the water might flow across its premises, it had only been so turned about ten days. While there was a rain the night of the arrival of the cattle, the weather had been dry up to that time and probably no water had been flowing in the ditch since it was dammed up outside and an egress provided for its flow across the railway's property. The cattle were not in the custody of the railway company while they were being dipped, nor afterwards. They were taken in charge by plaintiffs' employees in the morning, and the employees of plaintiffs and of

defendant Considine assisted in dipping the cattle. We can not discern any liability on the part of the railroad. Although it was alleged that Considine was the railway company's agent, there was no proof and no circumstances pointing to that fact. On the contrary, the relations of the railway company and Considine were shown by their written contract which was attached to plaintiffs' petition. The contract was a lease of a part of the stockyards premises for the purpose of installing a dipping vat for disinfecting cattle to be shipped into Oklahoma in conformity to federal requirements. It limited the use of the leased premises to the dipping of cattle shipped or to be shipped over the railway company's lines. No duty was breached by the Santa Fe, no liability was fixed upon it by the proof, and its demurrer to plaintiffs' evidence was properly sustained.

Turning to the evidence against Considine, the plaintiffs made a stronger, clearer case. Considine owned the dipping vat. He had charge of the dipping decoction furnished by the state of Oklahoma for disinfection. He knew the dipping solution was poisonous. He knew it was liable to splash out of the vat and find its way into the ditch. He knew cattle had been poisoned by drinking of the ditch water below the point where the dipping solution flowed into it. He had acknowledged a liability on account of such poisoning sometime before—a fact significant here only because it tended to prove that the ditch water was poisonous below the point where the arsenic solution flowed into it. He knew that the cattle would drink water polluted with dipping fluid, and he permitted a "swag" or basin to exist where such polluted waters could accumulate in rainy weather and flow thence into the ditch, and he turned the ditch across the stockyards to prevent town cows from drinking the polluted water. He negligently ignored the probability that cattle which had to pass through the stockyards would drink the polluted water. While we may be stating the above facts positively, it is only to test their sufficiency under the demurrer. A jury might not believe this rehearsal of facts, they may be wholly disproved by other evidence; but on demurrer the strongest possible effect is to be accorded to them. (*The State, ex rel., v. Gerhards,* 99 Kan. 462, 464, 162 Pac. 1149.) As to the proof that the cattle which

died were the cattle which drank of the poisoned water in the ditch running across the yards, a majority of the court believe that the facts and circumstances required the submission of that matter to the jury. If, as alleged and testified to, the cattle were all in good condition on their arrival in Elgin and before their dipping and drinking of the polluted ditch water, and they shortly afterwards became sick, and some died, it is for the jury to determine under all the circumstances shown and facts proved whether the poisoned water caused the sickness and death of the cattle; and justice can not be denied because plaintiffs could not in each instance identify the particular cattle that died as the individual beasts which were seen to drink the polluted ditch water. It may seem a little extraordinary that all these eight hundred cattle and more—every one of them—should have drunk out of the ditch while crossing it on their way to the pasture, especially after having been kept in a pen all one rainy night with wholesome water in their troughs available; but that too is a matter for the jury.

Again, it is urged that Considine was a public officer of the state of Oklahoma and of the federal government, performing duties calling for judgment and discretion, and that he was not liable personally unless his official acts were corrupt, malicious, or outside his official powers and duties. There can be no quarrel with that general doctrine, and if the negligence related to Considine's official inspection—scrutinizing them to see if they were free from disease and properly disinfected before their entrance into Oklahoma—Considine's liability and his relation to this case would be very different indeed. But at this stage of the case, so far as this court can now discern, Considine's establishment of the dipping vat, the splashing of the poisoned dipping fluid into the ditch, the cattle's drinking of the polluted ditch water, and the consequent injury to some and the death of others—none of these matters had anything to do with his official inspection of the cattle. The establishment and maintenance of the dipping vat was his private enterprise, something he could have undertaken even if he had held no offices under government; and his improper establishment and maintenance of the dipping vat, his improper disposition of the polluted ditch water by turning it across the yards where the cattle dipped in his vat

might drink it, can not be excused merely because he was a public official clothed with power 'to enforce live-stock health regulations. Considine's demurrer should have been overruled, and the cause will be remanded to the district court with instructions to that effect.