### LANCASTER et al. v. PITZER.
(No. 222–3357.)

(Commission of Appeals of Texas, Section B. March 16, 1921.)

Carriers ⏚215(2)—Carrier held not liable for loss of hogs before delivery from poison eaten on premises adjoining its shipping pens.

A carrier cannot be held for loss of hogs from eating poison found on premises adjoining its shipping pens, but not under its control, where a dipping vat for stock was in operation, and on which premises the hogs strayed while in the shipper's possession and before delivery or tender to the carrier; the carrier under such circumstances owing the shipper no duty either to keep such premises free from poison or to prevent the hogs from reaching the same, and the care taken by the shipper and his agents to prevent the hogs from eating the poison not being material.

Error to Court of Civil Appeals of Eighth Supreme Judicial District.

Suit by S. A. Pitzer against J. L. Lancaster and Pearl Wight, receivers of the Texas & Pacific Railroad, in which the defendants made L. A. Miller a party. Judgment for plaintiff against the receivers, and for the receivers against L. A. Miller, was affirmed by the Court of Civil Appeals (211 S. W. 313), and the receivers bring error. Judgments of the district court and Court of Civil Appeals reversed, and judgment rendered for the receivers.

J. M. Wagstaff, of Abilene, for plaintiffs in error.

Ben L. Cox, of Abilene, for defendant in error.

KITTRELL, J. J. L. Lancaster and Pearl Wight were receivers of the Texas & Pacific Railroad, and one L. A. Miller operated a dipping vat for dipping cattle, which vat, as the Court of Civil Appeals found, "was upon premises not under the control or management of the receivers, but owned and operated by one Miller under the supervision of the Live Stock Sanitary Board of Texas."

If it is meant by this language that the vat was owned and operated by Miller, the statement is correct, but he did not own the land, but as a copy of lease contract, which is made a part of the statement of facts, shows, the land was leased to him by the receivers, for the express purpose of operating the dipping vat which he exclusively managed, and the railway company had no part whatever in the management. The property leased to Miller adjoined the shipping pens.

Defendant in error was a dealer in hogs, and on October 8, 1917, drove 81 hogs ready for market down to the shipping point on the Texas & Pacific Railway at Abilene, in order to put them in the shipping pens preparatory to shipping them to Fort Worth.

When the hogs reached the shipping pen, or near it, the gate to the shipping pen was locked, and plaintiff in error had to send his son to the station four or five blocks away to get the key. When making previous shipments he always got the key first, but on the occasion in question he did not.

According to plaintiff's own testimony, it took the messenger something like 30 or 40 minutes to get the key and get back, and in

the meantime the hogs wandered about, and many of them ate some poisonous substance, evidently the refuse or deposits from the dipping vat, by reason of which about a third of them died, and most, if not all, of the rest were injured, and reduced in value, to such extent that the loss was approximately $2,-000.

The receivers pleaded that they were not responsible as they had no connection with the control or management of the dipping vat, or the ground on which it was located, and pleaded that if any recoverable loss occurred Miller was responsible in law therefor, and prayed judgment over against him, in event they were subjected to judgment.

Miller pleaded that the dipping vat was established, maintained, and controlled in accordance with the live stock quarantine law of the state as it applied to Taylor county, and not by him, and pleaded that the injury to the hogs was caused by the negligence of plaintiff, and that they were at large in violation of a city ordinance.

The case was submitted on special issues, and the jury found that the poison from the dipping vat was the cause of the death and sickness, and to the question where the hogs got the poison, the answer was, "In and around the stock pens," and found the receivers were negligent in permitting the poison to be in and around the pens, and that by the exercise of ordinary care they could have known that it was scattered around the pens and adjacent thereto. Judgment was entered pursuant to the verdict against the receivers, and judgment was given over against Miller in their favor for the same amount, practically $2,000.

Miller did not appeal, and on appeal by the receivers the judgment was affirmed. 211 S. W. 313.

There were many requested charges, and objection to these given, and both defendants presented lengthy motions for a new trial; but the case is before us in very concrete form.

In their application for writ of error, they use this language:

"We only ask upon the ground, which is the first assignment of error, the second assignment of error in the brief, and in the motion for a rehearing being exactly the same as the first assignment."

The first assignment of error in the application, which was the first ground of the receiver's motion for a new trial, is as follows:

"The court erred in refusing to give special charge No. 1 asked by these defendants requesting the court to charge the jury peremptorily in their favor, there being no evidence to show that the defendant receivers were negligent in permitting the plaintiff's hogs to get poison from the dipping vat, the evidence being entirely to the contrary and showing that these defendants were not negligent."

The Court of Civil Appeals bases its holding that the receivers were liable upon the following statement, which is copied from the opinion:

"The undisputed facts show that, for the purpose of shipping them to Fort Worth, the plaintiff drove his hogs up to the stock pens of the Texas & Pacific Railway Company, then in the custody and control of receivers; that upon arriving at the pens the men in charge of the hogs found the gate locked; that one of them went for the key, and while gone, about 15 minutes, the hogs were permitted to stray into an adjacent inclosure where a dipping vat was being conducted for dipping cattle for ticks with an arsenic solution. This dipping vat was upon premises not under the control or management of the receivers, but owned and operated by one Miller under the supervision of the live stock sanitary board of Texas; that when they were observed by the herders to be rooting about and eating something they were driven out immediately. There is other testimony that the hogs were rooting around the stock pens and in the stock pens. There is no evidence in this record that the poisonous substance was caused to be in and about the pens by the receivers or their agents, nor is there any evidence that they knew of its being there."

Pursuant to the foregoing statement, the Court of Civil Appeals says:

"The question presented by these assignments is: Is the defendant liable because the poison was there, or by the exercise of ordinary care, as found by the jury, they could have known that it was there?"

It answered the query so framed as follows:

"We think that they are properly held liable under the rule that they are required to keep suitable pens for the shipment of cattle (G., C. & S. F. Ry. Co. v. Trawick, 80 Tex. 270; same case, 15 S. W. 508, 18 S. W. 948; N. & W. Ry. Co. v. Harman et al., 91 Va. 601, 22 S. E. 490, 44 L. R. A. 289, 50 Amer. St. Rep. 855, and note), whether they put it there or knew of its being there or not."

The Trawick Case is one often cited, and it unquestionably holds that a railroad company is required to keep pens for the shipment of cattle suitable for the business, and in that case damages were adjudged against the railroad for cattle lost by reason of a defective pen.

There is no allegation in the instant case that plaintiff sustained any loss by reason of any defect in the shipping pens of the road. The injury to the hogs occurred, or the poison which occasioned the injury was obtained, before the hogs ever got into the shipping pens. They were kept or attempted to be kept in the angle formed by two wings of the stock pen until the key came, or about half an hour.

The plaintiff himself testified:

"Some of the hogs got in there around Mr. Miller's pens, and we had to get them out. I do not know about that George Stevens run them out as quick as he could. * * * That is where they got the poison. They were eating there in front of the pens and in the pens, and all the time they were just eating and rooting around."

Later in the course of his examination he testified:

"The pens of the Texas & Pacific Railway Company are hog proof pens. The pens of Mr. Miller are not hog proof."

It is evident therefore that, in addition to the fact testified to by plaintiff, the Texas & Pacific pens were both locked and hog proof—therefore the hogs could not get in there while being herded. There is the positive, unequivocal testimony of plaintiff that the hogs got the poison in the Miller pens, over which the railroad company had no control and out of which his servant Stevens testified the hogs could have been kept, and into which they entered and were there eating before Stevens knew it; and he said he noticed sick hogs before they got into the Texas & Pacific shipping pen. In this state of the evidence, there is no room left for any conjecture or any discussion as to the weight of the evidence, as to where the hogs got the poison.

The jury said they got "in and around the stock pens," which is a very elastic term and might apply if the hogs had gotten the poison a hundred yards, more or less, from the stock pens. But that they got in the Miller pens is shown beyond all doubt by plaintiff's own testimony.

Stevens said that while the hogs were being held there in front of the gate, some of them got under the fence into Miller's pen where the vat was; about half of them did so. There were 81 in all—

"As quick as I seen them I jumped over and run round and run them back. We did not care for them going around Mr. Miller's stock pens, except we wanted to keep them together. We could have kept them away from Mr. Miller's pens."

This being true, evidently the question of any defect in the pens of the railroad company was not involved. They were both hog proof and locked. The delay in putting the hogs in the pens arose from the fact that plaintiff waited till he got to the pens before sending for the key, instead of doing as he had invariably before done, getting the key first. Had he not done so, the hogs would have gone immediately into the Texas & Pacific pens. The question to be determined is whether the railroad company is, under the facts found by the Court of Civil Appeals, liable in law for the poisonous residue from the vat being left exposed in Miller's pens.

That court finds that the vat was on premises not under the control or management of the receivers, but owned and operated by one Miller under the supervision of the Live Stock Sanitary Board of Texas. Miller had been running the dipping pens about five years, and plaintiff had made many shipments of hogs from the railway pens, which were joined by the dipping pens, but from a diagram in the statement of facts appear to have been under an entirely separate enclosure.

Under such a state of facts we are unable to see the applicability of the law of the Trawick Case to the situation, though it be, as it is, unquestionably sound law.

The case of Railway v. Harman et al., cited by the court, is a Virginia case, and the conclusion reached by the court was manifestly correct. The railroad company knew that salt water was running through their loading pen, and the evidence clearly established that, owing to its negligence in permitting such a condition, the plaintiff suffered the loss alleged, from the death of lambs which drank the water. We have no such case before us.

We are bound by the finding of fact of the Court of Civil Appeals that the railroad company had no control or management over the premises on which the vat was situated. It was through Miller, who managed it and collected the fees, under the control of the Live Stock Sanitary Commission, and as we have said, there was no defect in the fence of the railway pens, and the gate to them was locked, and the hogs were found to be sick before the gate was opened and they were put in the shipping pen.

A railroad company might in fact fail to comply with the legal requirement to keep a pen suitable for shipping cattle, yet such failure would not render it liable for damages arising from some cause having no relation to such failure.

It is shown by the evidence that it was impossible to so herd hogs as to keep them from wandering around. It is shown too clearly that they were not being carefully watched because about half of them got into the Miller inclosure before Stevens or any one else knew of it. Plaintiff made no point that the gate being locked was improper, and that precaution seems to have been accepted as a matter of course.

His failure to get the key and unlock the gate before he got there with the hogs caused the delay and the consequent wandering of the hogs, which plaintiff says "40 men" could not have prevented.

We will suppose that while the unrestrainable hogs were wandering, they had reached the railroad track, and a passing fast passenger train had killed 24 as the poison did, would the railroad company have been responsible even if its shipping pen had been wholly defective for the purpose of shipping cattle? Most assuredly not.

Plaintiff in error cited in the Court of

Civil Appeals the case of Russell v. Considine, 101 Kan. 631, 168 Pac. 1095, a case between which and the instant case there is a similarity that is most unusual. The Court of Civil Appeals makes no reference to that case in its opinion.

In that case the railway company, as in this, leased a part of its premises to Considine for the purpose of dipping cattle, just as the lease was limited to Miller in the instant case, except that Considine could dip only such cattle as were shipped or to be shipped over the railroad's line, while Miller dipped for the public.

Cattle being shipped into Oklahoma were required to be dipped, and while Considine was a public officer of the state of Oklahoma, and a federal inspector, the dipping vat was his personal enterprise. He was shown to be responsible beyond all doubt for the water in the ditch out of which the cattle drank becoming poisoned. He had paid for cattle which had been poisoned from it, and had put up a wire fence to keep the town cattle from drinking from it. The railroad had nothing to do with dipping the cattle, and did not know the water in the ditch was poisonous—nor did the railroad in this case. In the Kansas Case, the railroad was held not to be liable. Plaintiff in this case and his witnesses said they knew of no danger, and had never had any hogs poisoned before though they had shipped many. In the Kansas case the cattle were not in the custody of the railroad while being dipped, or afterwards. In the instant case, the hogs were never in the custody of the railroad, but of their owner, and they were so carelessly herded that half of them were on Miller's premises before plaintiff or his agent knew it. They would have gone immediately upon their arrival on the grounds into the railroad's "hog proof" shipping pen, but for the neglect of plaintiff to get the key before bringing them to the gate.

Plaintiff had lived in Abilene about 11 years and had been shipping hogs about a year. He knew what Miller's premises were used for, and had been used for, for 5 years, and where they were situated. It is clear that there can be no liability fixed on the railroad company, because the hogs got the poison while under the care and control of plaintiff—and not of the railroad company—and because they got it on premises over which the railroad company had no control, as the Court of Civil Appeals found, but which, as plaintiff knew, was, and had been for 5 years, solely under Miller's control.

It is elementary that there can be no damages where there has been no breach of duty, and it is likewise elementary that a defendant be held liable only for such damages as it might be reasonably expected would result from a breach of duty—if one there be.

It does not appear to us that the railroad company could reasonably have expected that poisonous substances would be left exposed on Miller's premises, and that plaintiff would drive 81 head of hogs to or near those premises, and herd or try to herd them there while a key was procured to open the gate to the railway pen, instead of getting the key first, and that the hogs would be so carelessly herded that they would be allowed to get on Miller's premises before plaintiff or his servants knew it, and thereby be able to get the poison on premises over which the railway had no control, as the Court of Civil Appeals finds was the case.

We recommend that the judgments of the district court and Court of Civil Appeals be reversed, and judgment rendered in favor of plaintiffs in error.

McCLENDON, P. J. I concur in the conclusion that judgment should be rendered in favor of the receivers. The case has been fully developed, and the record shows without contradiction that the dipping pens were held under lease by defendant Miller, and the receivers had no control over or interest in them; that the poisonous substance eaten by the hogs was found upon the premises of Miller, and not upon those of the receivers; that the hogs, when they ate the poison, were in possession of plaintiff and had not been delivered or tendered to the receivers. Under these circumstances, the receivers owed no duty, either contractual or otherwise, to plaintiff, either to keep Miller's pens free from poison or to prevent plaintiff's hogs from reaching it. Owing no duty, there could be no liability. The conduct of plaintiff and his agents, and their prudence or imprudence, in not preventing the hogs from eating the poison, has no bearing upon any issue in the case.

POWELL, J. I concur in the views expressed by the Presiding Judge.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.